UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LORI OSTENFELD,

Plaintiff,

-v-                                                    No. 19-CV-06653-LTS-OTW

NEWSELA, INC. and MATTHEW GROSS,

Defendants.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

Plaintiff Lori Ostenfeld ("Plaintiff") brings this nine-count action against Newsela, Inc. ("Newsela") and Matthew Gross (collectively, "Defendants"). (Docket entry no. 5 ("Compl.").) Plaintiff asserts claims for discrimination, retaliation, failure to accommodate, and hostile work environment under the Americans with Disabilities Act, 42 U.S.C. section 12101 et seq. ("ADA"), the Family and Medical Leave Act, 29 U.S.C. section 2601 et seq. ("FMLA"), the New York Executive Law section 296 et seq. ("NYSHRL"), and the New York City Administrative Code section 8-107 et seq. ("NYCHRL"). Plaintiff also asserts a claim for breach of contract.

This Memorandum Opinion and Order addresses Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket entry no. 111.) Jurisdiction is proper under 28 U.S.C. sections 1331 and 1367(a). The Court has considered carefully the parties' submissions (docket entry no. 112 ("Defs. Mem."); docket entry

no. 122 ("Pl. Mem."); docket entry no. 128 ("Defs. Reply"))[1] and, for the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part.

## I. Background

The following facts are drawn from the parties' pleadings and documentary exhibits and are, unless otherwise noted, undisputed.[2]

### A. Plaintiff Joins Newsela

Plaintiff is a human resources professional with a Master's degree in Business Administration from the University of Pennsylvania's Wharton School of Business. (56.1 St. ¶ 5.) She is the founder and sole member of LJP Associates, LLC ("LJP"), a consulting practice that provides "interim leadership HR services." (56.1 St. ¶¶ 4-5.) Prior to founding LJP,

---

1 Pincites to materials on the docket refer ECF-designated page numbers.

2 Citations to "56.1 St." incorporate both Defendants' Local Rule 56.1 Statement (docket entry no. 115) and Plaintiff's Response to Defendants' Local Rule 56.1 Statement (docket entry no. 123 at 1-25). Citations to "56.1 Counterst." incorporate both Plaintiff's Rule 56.1 Statement of Additional Facts (docket entry no. 123 at 25-42) and Defendants' Response to Plaintiff's Rule 56.1 Statement of Additional Facts (docket entry no. 129). Citations to each of these Local Rule 56.1 statements incorporate by reference the documents and deposition testimony cited therein. See LOCAL RULE 56.1(d).

Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence and denied with only a conclusory statement by the other party, the Court finds such facts to be true. See LOCAL RULE 56.1(c), (d); Biberaj v. Pritchard Indus., Inc., 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012). Where a nonmoving party fails to respond to a Local Rule 56.1 Statement, the court is "permit[ted] . . . to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009). However, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." Jackson v. Fed. Exp., 766 F.3d 189, 194 (2d Cir. 2014). "In so doing, the Court may rely on other evidence in the record even if uncited." Id. (citing FED. R. CIV. P. 56(c)(3)). The Court has applied these principles in its evaluation of Defendants' motion.

Plaintiff worked in human resources for several large corporations, such as Merrill Lynch, JP Morgan, Goldman Sachs, and Barclays Investment Bank. (Id. ¶ 5; 56.1 Counterst. ¶ 2.)

On September 16, 2016, Newsela and LJP entered into a Consulting Agreement. (56.1 St. ¶ 3.) Matthew Gross was the CEO of Newsela at the time. (Id. ¶ 24.) Under the Consulting Agreement, LJP would be paid a flat fee of $20,400.00 for 100 hours of consulting services over a 30-day engagement starting September 16, 2016, with additional hours beyond that to be billed at $205.00 per hour. (Id. ¶ 3.) In exchange, LJP would provide employee relations consulting services, management coaching consulting services, benefits renewal consulting services, human resources policy review and revision consulting services, as well as other human resources consulting services on an as-needed basis. (Id.) Section 5 of the Consulting Agreement states that "each party shall be and act as an independent contractor and not as a partner, joint venturer, or agent of the other" and that LJP "is an independent contractor." (Docket entry no. 113-3 § 5.) From September 19, 2016, through January 16, 2017, Newsela paid LJP approximately $156,000 for 762 hours of work pursuant to the Consulting Agreement. (56.1 St. ¶ 8.)

Toward the end of 2016, Newsela believed that it "need[ed] a vice president level HR leader." (Id. ¶ 14 (quotation omitted).) Plaintiff alleges that, beginning mid-October 2016, she had assumed the role of Newsela's "*de facto* Chief People Officer." (56.1 Counterst. ¶ 4.) On December 22, 2016, after interviewing and considering other potential candidates, Newsela offered Plaintiff the position of Chief People Officer, which was the head of human resources and an executive level position reporting directly to Gross, who was the CEO. (56.1 St. ¶¶ 16-18, 24.) That same day, Plaintiff accepted the offer and executed an Employment Agreement. (Docket entry no. 113-7 at 6.) Plaintiff's Chief People Officer role was to become effective on

January 16, 2017, coinciding with the end of the Consulting Agreement. (56.1 St. ¶ 17; Docket entry no. 113-7 at 6 (Employment Agreement providing that "Your [Plaintiff's] employment is also contingent upon your starting work with the Company on or before January 16th, 2017").) LJP and Newsela both continued to perform pursuant to the Consulting Agreement until the Employment Agreement's effective date, January 16, 2017. (56.1 St. ¶ 20.)

B. Plaintiff Suffers Slip-and-Fall and Requests Remote Work

On March 17, 2017, Plaintiff slipped and fell at her condominium complex, injuring her knee and other parts of her body. (Id. ¶ 22.) Two months later, on May 8, 2017, Plaintiff underwent knee surgery. (Id. ¶ 23.) Plaintiff thereafter made a series of accommodation requests.

1. First Accommodation Request (to Work from Home)

Plaintiff made her first accommodation request on May 16, 2017, through an email to Gross. (Docket entry no. 113-8.) Plaintiff's email stated, "I'm cleared to return to the office on 5/30," and attached a doctor's note stating "[p]lease accommodate patient to work from home and return to work in the office on 5/30/2017." (Docket entry no. 113-8 at 2; 56.1 St. ¶ 24.) Defendants contend that they granted the request, and that Plaintiff worked from home from May 16 to May 30. (56.1 St. ¶ 24.) Plaintiff, however, alleges that she came into the office on May 24 for an all-hands meeting because "Matt [Gross] demanded that I come into the office even though he approved this leave." (56.1 Counterst. ¶ 15, 24.)

After her requested accommodation expired, Plaintiff returned to full-time, in-person work on May 31, 2017. (56.1 Counterst. ¶ 18.) Plaintiff contends that, once she returned to the office, Gross began to question her commitment to Newsela and to criticize her work performance. (Id.)

2. Second Accommodation Request (to Work from Home)

Two weeks later, on June 14, 2017, Plaintiff made her second accommodation request. (56.1 St. ¶ 25.) She emailed Gross a doctor's note that stated "[p]lease accommodate this patient to work from home on day's [sic] she has PT [physical therapy] for the next 2 months." (Id.) Defendants contend that they granted this request, and Plaintiff agrees that she worked from home three days per week. (Id. ¶ 31; 56.1 Counterst. ¶ 21.) Plaintiff also asserts, however, that Defendants "harass[ed] me" and "chang[ed] their minds and sa[id] 'we need you in the office.' So, I had to reschedule PT and so forth." (56.1 St. ¶ 25.)

3. Third Accommodation Request (to Not Attend the Company Retreat)

Newsela's company retreat was scheduled for July 10 through July 12, 2017, in Mohonk, New York. (Id. ¶ 27.) A week before the retreat, on June 30, Plaintiff made a third accommodation request in the form of a doctor's note stating that Plaintiff "cannot travel for business July 10-12." (Id. ¶ 29.) According to Plaintiff, Gross initially pressured her to attend the retreat in person, telling her "[y]ou have to be there" and "[w]e will get you a wheelchair." (Id. ¶ 30; 56.1 Counterst. ¶ 23.) Ultimately, however, Plaintiff did attend the retreat remotely. (56.1 St. ¶ 30; 56.1 Counterst. ¶ 24.)

C. Plaintiff Requests Leave

Plaintiff continued to work remotely three days a week until she made her fourth accommodation request on July 16, 2017. (56.1 St. ¶¶ 31-33.) From that point forward, until her employment was terminated, Plaintiff's accommodation requests were for leave from work.

1. Fourth Accommodation Request (for Leave)

On July 16, 2017, Plaintiff sent an email to Gross explaining that her "injuries from [the] accident in March are more extensive, and have resulted in a disability. . . . I need to be off from work for six weeks beginning Monday, July 17th and until August 28th." (Id.,

docket entry no. 113-11 at 2.) Plaintiff attached a doctor's note stating she was "advised to remain out of work until 8/28/17." (Id. at 4.)

On July 17, 2017, Plaintiff had a phone call with Gross. (56.1 Counterst. ¶¶ 28-29.) Gross asked Plaintiff what she wanted to do "professionally" and whether she wanted to be "out for six weeks, just flat out, out." (Id. ¶ 28.) Gross also said: "my doctors have recommended things to me and sometimes [I] follow them to a T, and sometimes I haven't. . . . [I]t's your doctor's recommendation, but ultimately it's your call . . . as to what you want to do . . . . I guess I just want you to own this decision." (Docket entry no. 113-47 at 4.) In a follow-up conversation on July 18, 2017, Gross said that "a specific thing that, that I'm looking at right now, is, is evidence of injury . . . beyond . . . the doctor's note." (Id. at 6.) Gross explained that "you're an honest person and . . . there's no doubt that you're injured, but . . . you've submitted . . . a simple note just from the doctor . . . . [I]f there's somebody who is . . . less honest down the road and they submitted that form and we said, you know what, this really isn't good enough evidence, they could call it discrimination." (Id.) Plaintiff testified that Gross "badgered" and "harassed" her during the call. (56.1 St. ¶ 33.) The next day, on July 19, 2017, Gross replied to Plaintiff's accommodation request, "approving unpaid leave through August 28." (Docket entry no. 113-11 at 2.)

2. Fifth Accommodation Request (for Leave)

On August 25, 2017, a few days before her fourth requested accommodation was set to end, Plaintiff submitted a fifth accommodation request to Gross, asking to extend leave to September 25, 2017. (56.1 St. ¶ 38; docket entry no. 113-16 at 4-5.) Plaintiff sent a doctor's note, which stated that Plaintiff "is under my care and is unable to return to work on 8/28/17. Patient's work status will be re-evaluated on 9/25/17." (Docket entry no. 113-15 at 3; 56.1 St. ¶

38.) After Plaintiff sent her request, Gross replied "[g]ive me a little time to evaluate the situation. I may ask to hop on the phone with you over the weekend." (Docket entry no. 113-16 at 4.) The two spoke on August 27, 2017. (Id.; see also 56.1 St. ¶ 41.) On the call, Gross explained to Plaintiff that "I'm in a tough situation here . . . because . . . you're injured . . . . At the same time, . . . we're really struggling without leadership. . . . So . . . right now, . . . I'm of the mind that, that I don't want to grant your request." (Docket entry no. 113-47 at 9.) Gross further said "I'm happy to accommodate some, yeah, some work from home or things like that . . . . But . . . we . . . just really need you back at work." (Id. at 10.) The two appeared to reach an impasse, and Plaintiff concluded by saying "why don't I just keep in touch with you? And [if] I have more information tomorrow [from a second doctor's opinion] that's different, I'll let you know as soon as know." (Id. at 13.) Following the call, Plaintiff and Gross continued to exchange emails about her accommodation request. (Docket entry no. 113-16.)

On August 29, 2017, Gross text messaged Plaintiff: "Sending another transactional email is not the way to handle this. We're human beings. We need to address this as humans." (56.1 Counterst. ¶ 35.) The next day, on August 30, 2017, Gross asked to talk with Plaintiff again because "this is a complex situation that requires more than just a transactional request before we come up with a way forward," to which Plaintiff replied, "I am not feeling up to a call at the moment because of the discomfort." (Docket entry no. 113-16 at 2-3.) That same day, Gross approved Plaintiff's request for leave, but "ask[ed] a couple things as part of the leave grant: 1) we have a call each week to discuss your status and to get your advice about continuity; 2) next time you have a question or request or change in status, you schedule some time to speak with me by phone or hangout so we can discuss." (Id. at 2.) The next day, September 1, 2017, Plaintiff responded, "Thanks for your email, I appreciate your assistance. Whatever assistance I

provide needs to be consistent with my doctor's recommendations." (Id. at 2.) Gross replied, "I'm sorry but is that a yes or a no?" (Id.) Plaintiff did not appear to respond. (Id.)

On September 11, 2017, Plaintiff spoke with Gross on the phone. (56.1 St. ¶ 50.) During their call, Gross stated, "We haven't received a doctor's note mandating that you need to be out of work . . . it said it advised. It didn't say you have to . . . advising is, leaves the choice in your hands." (56.1 Counterst. ¶ 38.) Gross also said "people have reached out to find out how you're doing and said that they received no response from you . . . somebody in your position . . . I'd expect to see a lot more sort of care about what's going on, and a desire to sort of talk things through and gratitude, quite frankly." (Id.)

3. Sixth Accommodation Request (for Leave)

Later that same day, September 11, 2017, Plaintiff submitted her sixth accommodation request (her third request for leave), asking to extend her leave to October 2, 2017. (56.1 St. ¶ 50.) Plaintiff sent Gross a doctor's note that said, "[a]t this time the patient is unable to return to work. Their **estimated** return to work date is 10/2/17 and subject to change." (Docket entry no. 113-18 (emphasis in original).) After Gross did not respond, Plaintiff renewed her request on September 15, 2017, and Gross approved the request that same day. (Docket entry no. 113-20 at 3-4.)

4. Seventh Accommodation Request (for Leave)

On September 27, 2017, Plaintiff emailed Gross her seventh accommodation request (her fourth leave request). (56.1 St. ¶ 53.) Plaintiff wrote that she would have shoulder surgery on October 9, and she attached a doctor's note saying she was "unable to return to work" until October 30. (Docket entry no. 113-20.) Two days later, on September 29, 2017, Gross replied, approving Plaintiff's request but warning that Newsela would "be unable to extend [her]

leave beyond [October 30] as it would impose an undue hardship on the company." (Docket entry no. 124-15 at 2.) Gross explained, "You [Plaintiff] hold a high-level position with the company, in charge of human resources, and unfortunately, keeping that position vacant for longer than that will pose a significant difficulty on the operations of the company." (Id.) Gross concluded by stating that "if you are unable to do so [return by October 30], please let me know as the company would be willing to offer you a separation package to help with your transition." (Id.)

5. Eighth Accommodation Request (for Leave)

On October 26, 2017, Plaintiff submitted her eighth—and final—accommodation request via email. (56.1 St. ¶ 60.) Plaintiff wrote that her "doctors have advised that I require leave through December 4th" and attached a doctor's note stating "[a]t this time the patient is unable to return to work. Their **estimated** return to work date is 12/4/17 and subject to change." (Docket entry no. 113-23 at 4 (emphasis in original).) The next day, October 27, 2017, Gross denied her request by email, saying that "it would be an undue hardship to continue to hold [her] position open after October 30." (Id. at 2.) Gross explained that "Your [Plaintiff's] position as the Chief People Officer has many high-level and mission-critical responsibilities for Newsela and its business, most of which have been put on hold during your leave causing Newsela material harm and cannot be delayed any longer" and that Newsela was unable to "locate a satisfactory temporary replacement for your executive position." (Id.) Gross concluded by stating that Newsela was "willing to offer you a mutually agreed-upon transition package" if Plaintiff were unable to return by October 30, 2017. (Id.)

D. Plaintiff's Employment is Terminated

Following the denial of her eighth accommodation request, Plaintiff did not return to work on October 30, 2017, and her employment terminated at that time. (56.1 St. ¶ 62; 56.1 Counterst. ¶ 45; docket entry no. 113-23.) On October 30, 2017, Plaintiff sent Gross an email, asking him to confirm that Newsela was terminating her employment. (Docket entry no. 113-23.) Gross did not appear to respond. (Id.)

E. Subsequent Events

On November 28, 2022, Plaintiff was offered a position as a part-time Universal Banker I at Peapack-Gladstone Bank. (56.1 St. ¶ 91.) The position was set to begin on December 12, 2022, but Plaintiff requested a postponement to January 3, 2023. (Id. ¶¶ 91-92.) On January 3, 2023, Plaintiff informed Peapack-Gladstone Bank that she needed "more time to heal from the injuries; and [did] not have a definitive date when that would be." (Id. ¶ 92.) Subsequently, on January 6, 2023, Plaintiff informed the bank that she "would not be able to work every day; at most it would be two days- [sic] a week half days." (Id.) In response, the bank indicated that it would not be able to accommodate such a work schedule. (Id.) The record indicates that Plaintiff was not employed between October 30, 2017, and the time of her interactions with Peapack-Gladstone Bank (see id. ¶¶ 91), and that she received Social Security Disability Insurance and/or long-term disability insurance benefits during at least part of that period (id. ¶¶ 65, 80-81, 90).

## II. Discussion

Defendants move for summary judgment, seeking the dismissal of all of Plaintiffs' claims. Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. (citing Celotex Corp., 477 U.S. at 322-23). "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

In determining whether there is a genuine issue of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted). In employment discrimination cases, where direct evidence of

intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination. Turner v. NYU Hosps. Ctr., 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994)), aff'd, 470 F. App'x 20 (2d Cir. 2012).

The Court addresses each of Plaintiff's claims in turn, granting in part and denying in part Defendants motion for summary judgment.

A. ADA, NYSHRL, NYCHRL Failure to Accommodate Claims (Counts Two, Four, and Six)

First, the Court addresses Plaintiff's failure to accommodate claims, granting in part and denying in part Defendants' motion. To establish a failure to accommodate claim under the ADA, a plaintiff must demonstrate "(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation [the employee] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 94 (2d Cir. 2015) (quoting McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 97 (2d Cir. 2009)). NYSHRL and NYCHRL failure to accommodate claims are based on the same elements. Sivio v. Vill. Care Max, 436 F. Supp. 3d 778, 790 (S.D.N.Y. 2020). A failure to accommodate claim "do[es] not require proof of discriminatory intent." Brooklyn Ctr. for Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co., 955 F.3d 305, 312 (2d Cir. 2020). Because intent is not required, the McDonnell Douglas burden-shifting framework does not apply. Nazario v. Promed Personnel Servs. NY Inc., No. 15-CV-06989-LGS, 2017 WL 2664202, at *5 n.1 (S.D.N.Y. June 19, 2017) (citing McMillan v. City of New York, 711 F.3d 120, 129 (2d Cir. 2013)).

Plaintiff made eight accommodation requests: two requests for work from home, one request to not attend the Newsela retreat, and five requests for leave. The Court considers each in turn and the parties' arguments, which center on the third and fourth factors.

1. First Accommodation Request

Plaintiff made her first accommodation request on May 16, 2017, asking to work from home until May 30, 2017. (56.1 St. ¶ 24.) The parties agree that the request was formally granted, but Plaintiff alleges that Gross "demanded" she come into the office on May 24, thus effectively denying the request. (Id. ¶ 24; 56.1 Counterst. ¶ 15.) Because there are issues of fact as to whether Gross demanded her physical presence and whether any such demand vitiated the grant of the requested accommodation, summary judgment is denied as to this element of the failure to accommodate claim.

2. Second Accommodation Request

Plaintiff made her second accommodation request on June 14, 2017, asking to work from home to attend physical therapy over the next two months. (56.1 St. ¶ 25.) Again, there seems to be no dispute that the request was granted as a formal matter, but Plaintiff proffers that she was unable to keep to her physical therapy schedule because Defendants "harass[ed] me" and "chang[ed] their minds and sa[id] 'we need you in the office.'" (Id. ¶ 25.) Thus, there is a factual dispute as to whether the requested accommodation was, effectively, denied.

3. Third Accommodation Request

Plaintiff made her third accommodation request on June 30, 2017, asking to attend the Newsela company retreat remotely. (56.1 St. ¶ 29.) Plaintiff concedes that she did not attend the retreat in person. (Id. ¶ 30; Counterst. ¶ 24.) Because this request was granted, Plaintiff does not make a prima facie case for failure to accommodate. See Williams v. Geiger,

447 F. Supp. 3d 68, 83 (S.D.N.Y. 2020). Plaintiff's claim that Gross pressured her to attend the retreat in person does not negate the fact that her accommodation request was ultimately granted. Accordingly, Defendants' motion is granted as to Plaintiff's third accommodation request.

4. Fourth through Seventh Accommodation Requests

Plaintiff made her fourth accommodation request on July 16, 2017, asking for leave from work until August 28. (Docket entry no. 113-11 at 2.) Plaintiff's next three accommodation requests—her fifth through seventh—each asked for successive extensions of her leave. (56.1 St. ¶¶ 38, 50, 53.) Each of the requests was granted; Plaintiff did not do work for Newsela from and after July 16, 2017. (Id. ¶¶ 47, 50, 54.)

Plaintiff contends, however, that it is "a mischaracterization of the situation" to say that Defendants "granted" these requests. (Id. ¶¶ 47, 50, 54.) According to Plaintiff, Defendants initially denied her requests and "made her beg for the accommodation[s]." (Id. ¶ 49.) Plaintiff further asserts that, while she was on leave, Defendants "did not respect the need for her to rest and recuperate, and, instead, Gross constantly barraged her with questions, requests, insults, and harassment about when she would return to the office." (Id.) Plaintiff's contentions do not negate the fact that Plaintiff's requests to be relieved from her work duties were ultimately granted, albeit grudgingly and not without pushback. See Williams v. Geiger, 447 F. Supp. 3d 68, 83 (S.D.N.Y. 2020). Consequently, Defendants' motion is granted as to Plaintiff's fourth, fifth, sixth, and seventh accommodation requests.

5. Eighth Accommodation Request

Plaintiff made her eighth accommodation request on October 26, 2017, asking to extend her leave further, through December 4, 2017. (56.1 St. ¶ 60.) There is no dispute that Defendants denied this request. (Id. ¶ 61.) In support of their summary judgment motion,

Defendants make three arguments. (Defs. Mem. at 27-34.) First, Defendants contend that Plaintiff's request was unreasonable because it was a request for indefinite leave. Second, Defendants argue that the request was unreasonable because Plaintiff was unable to perform the "essential functions" of her job as early as July 2017. Finally, Defendants aver that they denied Plaintiff's request because extending her leave without permanently replacing Plaintiff as Chief People Officer would have caused the company "undue hardship." None of these arguments is sufficient on this record to establish that Defendants are entitled to summary judgment.

i. The Reasonableness of Plaintiff's Request

First, Defendants contend that Plaintiff's request was unreasonable as a matter of law because it was a request for indefinite leave.[3] See Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover."). According to Defendants, Plaintiff had already taken nearly fifteen weeks of leave by the time she made her October 26, 2017 request for yet more leave, and there was no indication that Plaintiff would return to work soon—let alone, ever. (56.1 St. ¶¶ 53-54.) While it is true that Plaintiff had already been granted successive leaves over an extended period, Plaintiff's proffered evidence frames genuine issues of fact as to her ability return to

---

3 "[U]nder the NYCHRL, a request for indefinite leave is not unreasonable as a matter of law." Vangas v. Montefiore Med. Ctr., 6 F. Supp. 3d. 400, 416 (S.D.N.Y. 2014). Rather, "the NYCHRL defines 'reasonable accommodation' more broadly than the ADA and NYSHRL as 'such accommodation that can be made that shall not cause undue hardship in the conduct of the [employer's] business.'" Tse v. New York Univ., No. 10-CV-07207-DAB, 2016 WL 10907062, at *22 (S.D.N.Y. Aug. 29, 2016) (quoting N.Y.C. ADMIN. CODE § 8-102(18)). There is a genuine issue of fact as to whether Plaintiff's accommodation request would have caused Defendants "undue hardship."

work and whether additional leave without a guaranteed return date would have constituted an unreasonable accommodation.

For one, Plaintiff's final, October 26, 2017 request was not, on its face, a request for indefinite leave. Cf. Wisneski v. Nassau Health, 296 F.Supp.2d 367, 374 (E.D.N.Y. 2003) (finding plaintiff's request to be unreasonably indefinite where plaintiff's request read: "I do not know how long I will be unable to work. I would like to ask for leave without pay status."). Plaintiff only asked to extend her leave through December 4, 2017. (56.1 St. ¶ 60.) This was a request for a "finite, determinable extension of leave to recover from her condition." See Kruly v. Akoustis Techs., Inc., No. 21-CV-06181-FPG, 2023 WL 3995467, at *6 (W.D.N.Y. June 14, 2023). At this stage, the Court must draw all reasonable inferences in favor of Plaintiff and construe Plaintiff's October 26, 2017 request as one for temporary leave.

"Temporary leaves of absence . . . can provide a reasonable accommodation under the ADA where the leave will likely enable an employee to return to work." Wenc v. New London Bd. of Educ., No. 14-CV-0840-VAB, 2016 WL 4410061, at *13 (D. Conn. Aug. 16, 2016), aff'd, 702 F. App'x 27 (2d Cir. 2017). Plaintiff asserts that the requested leave was reasonable because it would have facilitated her return to work. She testified that "[a]ll of the accommodations requests were for me to have time off to heal, to get better, to get back to work" and that she "wanted to go back to the office . . . As soon as I was better and able to." (Docket entry no. 113-2 ("Ostenfeld Dep.") at 102, 98.) Plaintiff further attests, in connection with this motion practice, that "Gross's abusive treatment" of her, in response to her accommodation requests, "significantly exacerbated [her] medical condition" and is what has ultimately "prevented [her] from returning to the workforce" in any capacity. (Docket entry no. 125 ("Ostenfeld Decl.") ¶ 47.) Moreover, Plaintiff's October 26, 2017 request would have only

brought her to twenty weeks (five months) of leave in total, and courts have found requests for leave of up to six months to be reasonable and not indefinite. E.g., Kruly v. Akoustis Techs., Inc., No. 21-CV-06181-FPG, 2023 WL 3995467, at *6 (W.D.N.Y. June 14, 2023); Hutchinson v. Ecolab, Inc., No. 09-CV-01848-JBA, 2011 WL 4542957, at *9 (D. Conn. Sept. 28, 2011).

ii. Plaintiff's Qualification

Separately, but relatedly, Defendants contend that Plaintiff was unable to perform the "essential functions" of her job, with or without the accommodations she requested. Powers v. Polygram Holding, Inc., 40 F. Supp. 2d 195, 201 (S.D.N.Y. 1999) ("[A] requested leave of absence is an unreasonable request for accommodation" where "even when the employee returns from the requested leave of absence, he or she will still be unqualified to perform the essential functions of their job."). Put differently, the issue is whether Plaintiff meets the "qualification prong" of a prima facie case. Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 136 (2d Cir. 2016). According to Defendants, as early as July 2017, Plaintiff was not capable of returning to work—regardless of whether her accommodation requests for leave were granted. Thus, Defendants aver, those requests were unreasonable as a matter of law.

To attempt to demonstrate Plaintiff's lack of qualification (i.e., that she was incapable of performing her duties at the time of the request and would be for an extended time thereafter), Defendants cite: statements Plaintiff made to her disability insurance provider, Guardian Insurance Company, in connection with her application for benefits (56.1 St. ¶¶ 35, 37, 55-58, 65-66, 68, 75-76, 82, 84); statements Plaintiff made to the Social Security Administration ("SSA") in connection with her application for Social Security Disability Insurance (56.1 St. ¶ 35, 78-81); and statements Plaintiff made while testifying during a May 24, 2018, deposition in connection with her lawsuit against her condominium complex (56.1 St. ¶¶ 70, 72.).

Invoking the doctrine of judicial estoppel, Defendants argue that Plaintiff's previous statements—where she purportedly said she was unable to work as of July 2017 and thereafter—preclude her from taking a contrary position here. See New Hampshire v. Maine, 532 U.S. 742, 749 (2001). To establish judicial estoppel, Defendants must show that "1) [Plaintiff's] later position is 'clearly inconsistent' with its earlier position; 2) [Plaintiff's] former position has been adopted in some way by the court in the earlier proceeding; and 3) [Plaintiff] would derive an unfair advantage against the party seeking estoppel." DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (citation omitted).

As to Plaintiff's statements to her insurance provider and her prior deposition testimony, judicial estoppel is inapplicable because there is no evidence that Plaintiff's statements were "adopted by the first tribunal in some manner, such as by rendering a favorable judgment." Kovaco, 834 F.3d at 137.

While judicial estoppel is inapposite, Plaintiff's prior statements are admissible as party-opponent statements under Federal Rule of Evidence 801(d)(2)(A). These prior statements frame issues of fact as to Plaintiff's ability to perform the essential functions of her job and the reasonableness of her accommodation request. With respect to Plaintiff's statements to the SSA, Defendants fail, however, to establish that Plaintiff's earlier position is "clearly inconsistent" with her current position. Defendants' proffered evidence only establishes that the SSA determined that Plaintiff "met the legal requirements for disability benefits as of July 17, 2017." (56.1 St. ¶¶ 35, 79.) This is not a "direct and irreconcilable contradiction" with Plaintiff's instant claim that, had her accommodation request been granted, she would have been able to return to work. DeRosa, 595 at 103 (citation omitted).

iii. Undue Hardship on Defendants

Finally, Defendants contend that they are entitled to summary judgment because granting Plaintiff's request would have imposed an "undue hardship" on them. Under the ADA and NYCHRL, an "undue hardship" is "affirmative defense, proof of which requires a detailed showing that the proposed accommodation would 'require significant difficulty or expense.'" Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 121-22 (2d Cir. 2004) (citation omitted) (ADA); Vangas v. Montefiore Med. Ctr., 6 F. Supp. 3d 400, 417 (S.D.N.Y. 2014) (NYCHRL). Under the NYSHRL, however, undue hardship is not an affirmative defense, and the plaintiff bears the burden of proving lack of undue hardship. Greenbaum v. New York City Transit Auth., No. 21-1777, 2022 WL 3347893, at *4 n.4 (2d Cir. Aug. 15, 2022) (summary order). Courts look to several enumerated factors to analyze undue hardship. 42 U.S.C. § 12111(10)(A)-(B) (ADA); N.Y. Comp. Codes R. & Regs. tit. 9, § 466.11(b)(2) (NYSHRL); N.Y.C. Admin. Code § 8-102 (NYCHRL).

According to Defendants, "Plaintiff's continuing and seemingly indefinite absence, le[ft] Newsela without a [Chief People Officer] for an extended period of months, [which] caused an undue hardship[.]" (Defs. Mem. 34.) Defendants proffer evidence that Plaintiff's extended absence negatively affected Newsela's operations. (56.1 St. ¶ 49.) Gross attempted to distribute Plaintiff's responsibilities to other employees and hired an HR consultant but maintained those measures were insufficient. (56.1 St. ¶ 49; docket entry no. 113-1 ("Gross Dep.") at 253-58.) In opposition, Plaintiff proffers that Newsela had previously hired an interim Chief Financial Officer, that the HR consultant performed some of her job duties, and that certain of her colleagues had remarked that her absence did not have such a negative or

disruptive impact. (56.1 Counterst. ¶¶ 42-44). Summary judgment must be denied in light of these factual disputes.

* * *

Defendants' motion for summary judgment is granted as to Plaintiff's claim that Defendants failed to accommodate her third, fourth, fifth, sixth, and seventh accommodation requests. Defendants' motion is denied as to Plaintiff's first, second, and eighth accommodation requests.

B. ADA, NYSHRL, NYCHRL Retaliation Claims (Counts Three, Five, and Seven)

Next, the Court turns to Plaintiff's retaliation claims, denying Defendants' motion. Retaliation claims under the ADA and NYSHRL,[4] are evaluated under the three-step, burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).[5] Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (ADA and NYSHRL). First, a plaintiff must make a prima facie case of retaliation, which requires showing that "(1) he engaged in an activity protected by the [statute]; (2) the employer was aware of this

---

4 Because all of the allegedly culpable conduct predates October 2019, the Court does not need to consider the October 11, 2019 amendment to the NYSHRL, which changed the analytical standard. See Syeed v. Bloomberg L.P., 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021), vacated and remanded on other grounds, No. 22-1251, 2024 WL 2813563 (2d Cir. June 3, 2024). Accordingly, all references to the NYSHRL refer to the pre-2019 version.

5 The NYCHRL applies a more lenient standard, under a plaintiff need only show that "she took an action opposing her employer's discrimination [or engaging in protected activity], and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Ward v. Cohen Media Publications LLC, No. 22-CV-06431-JLR, 2023 WL 5353342, at *13 (S.D.N.Y. Aug. 21, 2023) (citation omitted). NYCHRL applies a "motivating factor" causal standard, under which a plaintiff need only show that "retaliatory animus played *some* role in the employer's decision." Cardwell v. Davis Polk & Wardwell LLP, No. 19-CV-10256-GHW, 2021 WL 4434935, at *34 (S.D.N.Y. Sept. 23, 2021). Because Plaintiff's claims survive under the more stringent ADA and NYSHRL standards, they also survive under the more lenient NYCHRL standard.

activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." Treglia, 313 F.3d at 719. With respect to the last element, which is also referred to as "retaliatory intent," see id., two different causation standards exist, depending on the type of claim. For an ADA claim, the plaintiff must show "that the retaliation was a 'but-for' cause of the employer's adverse action," which does not require that "retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Duplan v. City of New York, 888 F.3d 612, 625 (2d Cir. 2018) (citation omitted). It is not settled whether the NYSHRL requires but-for causation or a motivating factor, but at least some courts in this Circuit have applied but-for causation.[6] Farmer v. Shake Shack Enters., LLC, 473 F. Supp. 3d 309, 333 n.7 (S.D.N.Y. 2020).

"Once a plaintiff establishes the prima facie case, the burden shifts to defendant 'to articulate a legitimate, non-retaliatory reason for the challenged employment decision.'" Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d 237, 250-51 (S.D.N.Y. 2015) (citations omitted). "If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id. (quoting Treglia, 313 F.3d at 721)). A plaintiff's burden on the final McDonnell Douglas step "may be carried by the presentation of additional evidence," or "it may often be carried by reliance on the evidence comprising the prima facie case, without more,' if that evidence is independently sufficient under step three of McDonnell

[6] The October 11, 2019 amendment to the NYSHRL introduced the "motivating factor" test for causation, "bringing the standard for claims under the NYSHRL closer to that of the NYCHRL." Lee v. Riverbay Corp., 751 F. Supp. 3d 259, 274-75 (S.D.N.Y. 2024).

Douglas." Bart v. Golub Corp., 96 F.4th 566, 576 (2d Cir.) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995)) cert. denied, 145 S. Ct. 173 (2024). If a plaintiff meets its burden on the final step, the "conflict between the plaintiff's evidence establishing a prima facie case[, as well as any additional evidence showing pretext,] and the employer's evidence of a [non-retaliatory] reason reflects a question of fact to be resolved by the fact finder after trial." Id.

Plaintiff presents two theories of retaliation premised on two different "adverse employment actions" taken in retaliation for her requests for accommodation. The first adverse employment action is her termination. The second adverse employment action is a hostile work environment: Plaintiff alleges that, in retaliation for her requests for accommodations, Gross harassed her; took actions inconsistent with Plaintiff's granted accommodations, such as pressuring her to work in person when she had been granted remote work accommodations; and tried to intimidate her into withdrawing her accommodation requests. Both theories survive summary judgment, and the Court addresses each in turn.

1. Plaintiff's Termination

Plaintiff presents a prima facie case that her termination was unlawful retaliation. Her accommodation requests were "protected activities." Wells v. Achievement Network, No. 18-CV-6588-KPF, 2021 WL 810220, at *11 (S.D.N.Y. Mar. 2, 2021) ("Protected activities include requests for reasonable accommodations."). Her termination was an adverse employment action causally connected to her accommodation requests, and there is sufficient evidence for a jury to infer retaliatory intent. (See 56.1 St. ¶¶ 53, 60; docket entry nos. 113-20, 124-15, 113-23.) Defendants dispute the reasonableness of Plaintiff's accommodation requests, supra § II.A.5.i, but genuine issues of fact preclude dismissal at this stage.

On step two of McDonnell Douglas, Defendants contend that they "established a legitimate, nondiscriminatory reason for not being able to keep Plaintiff's job open indefinitely" because "Newsela had been without its [Chief People Officer] and could not reasonably continue to operate in a time of rapid growth without a key Executive Team member." (Defs. Mem. at 35.) Thus, the burden falls to Plaintiff to proffer evidence that Defendants' explanation is pretext. Plaintiff has met her burden by proffering evidence that Newsela could have functioned with an interim replacement and that her responsibilities could have been reallocated to other employees (56.1 Counterst. ¶¶ 42-44), as well as evidence that her requests for leave were not indefinite, as Defendants claim, but that she intended to return as soon as she recovered (Ostenfeld Dep. 99; Ostenfeld Decl. ¶ 41); see also supra § II.A.5(i) (discussing issues of fact as to the reasonableness of Plaintiff's accommodation requests, her ability to perform the essential functions of her job, and whether Plaintiff's requests caused Defendants undue hardship). There was also a strong temporal proximity and causal connection between Plaintiff's fifth request for leave (i.e., her eighth accommodation request) on October 27, 2017 and her eventual termination on October 30, 2017. (Docket entry no. 113-23); see Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013). Altogether, this evidence satisfies Plaintiff's burden under the more stringent but-for cause test, as well as the relaxed motivating factor test. Accordingly, Plaintiff's claim survives summary judgment.

2. Retaliatory Hostile Work Environment

The Court now considers Plaintiff's second theory, which is cognizable as a "retaliatory hostile work environment claim." As a threshold issue, Defendants contend that Plaintiff's theory of retaliation was not properly pled because "her claim for retaliation in the Complaint only alleges that the retaliation consisted of her termination." (Defs. Reply at 8-9

(citing Compl. ¶ 66).) This argument fails because magic words are not required to allege retaliation or hostile work environment—Plaintiff need only describe the harassment she claims she experienced. Cruz v. Coach Stores, Inc., 202 F.3d 560, 568-69 (2d Cir. 2000). Plaintiff's Complaint meets that bar, describing, at length, the alleged events on which she bases her retaliatory hostile work environment claim. (E.g. Compl. ¶¶ 34, 46, 48, 52, 57, 68.) Defendants have had fair notice and have not identified any unfair prejudice arising from Plaintiff's current framing of the claim. Cf. Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000).

As to the merits, Defendants dispute whether Plaintiff has established the third element of a prima facie case. In the context of a retaliatory hostile work environment claim, the adverse employment action is the hostile work environment itself. To show a hostile work environment, Plaintiff must show that Defendants' "actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from [engaging in protected activities]." Carr v. New York City Transit Auth., 76 F.4th 172, 180 (2d Cir. 2023). To be "materially adverse," an action must cause more than "trivial harms," "petty slights," or "minor annoyances." Id. at 179 (quoting Burlington Northern, 548 U.S. at 68).

Applying this standard, the Court finds that Plaintiff has adduced sufficient evidence to create a triable issue of fact. Plaintiff proffers evidence that Defendants harassed her in retaliation for her accommodation requests and pressured her to withdraw her requests. For instance, she was pressured into going into the office and traveling even though she had been granted work from home accommodations. (56.1 St. ¶¶ 20, 25, 30; 56.1 Counterst. ¶¶ 15, 23.) Similarly, when she asked for medical leave, Gross made comments that a reasonable juror could interpret as intimidating and coercive. For example, in response to Plaintiff's first request for

leave (i.e., her fourth accommodation request), Gross told Plaintiff, "my doctors have recommended things to me and [I] sometimes follow them to a T, and sometimes I haven't. . . . I guess I just want you to own this decision." (Docket entry no. 113-47 at 4; 56.1 Counterst. ¶ 28.) Accordingly, Plaintiff's claim survives summary judgment.

C. ADA, NYSHRL, NYCHRL Discrimination Claims (Counts Two, Four, and Six)

Next, the Court addresses Plaintiff's discrimination claims, denying Defendants' motion. The McDonnell Douglas framework applies to discrimination claims under the ADA and NYSHRL.[7] McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013) (ADA); Farmer v. Shake Shack Enters., LLC, 473 F. Supp. 3d 309, 323 (S.D.N.Y. 2020) (NYSHRL). First, to establish a prima facie case of discrimination, Plaintiff must show: "(1) plaintiff's employer is subject to the [statute]; (2) plaintiff was disabled within the meaning of the [statute]; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered [an] adverse employment action because of her disability." Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004). In the context of an ADA claim, "but-for" causation is required for the last element. Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019). For NYSHRL claims, a plaintiff need not show but-for causation; she may also make a prima facie case by showing that retaliation was a "motivating

[7] The NYCHRL applies a more lenient standard, under which a plaintiff need only show that she was "treated 'less well' . . . because of a discriminatory intent," i.e., that the unequal treatment was based, at least in part, on a protected characteristic." Lee v. Riverbay Corp., 751 F. Supp. 3d 259, 275 (S.D.N.Y. 2024) (citation omitted). "[T]he challenged conduct need not even be 'tangible' (like hiring or firing), and the discriminatory motive need only be 'one of the motivating factors' for the unlawful discrimination, rather than the 'sole motivating factor.'" Id. (citation omitted). Because Plaintiff's claims survive under the more stringent ADA and NYSHRL standards, they also survive under the more lenient NYCHRL standard.

factor" in the adverse action. Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d 309, 324, 328 (S.D.N.Y. 2020). This last element is also referred to as "discriminatory intent." See Dooley v. JetBlue Airways Corp., 636 F. App'x 16, 21 (2d Cir. 2015) (summary order) (citing Cortes v. MTA N.Y.C. Transit, 802 F.3d 226, 231 (2d Cir. 2015)).

As with her retaliation claims, Plaintiff presents two theories of discrimination premised on two different "adverse employment actions" taken as a result of her disability. The first adverse employment action is her termination. The second adverse employment action is a hostile work environment. Both claims survive summary judgment.

1. Plaintiff's Termination

Plaintiff's termination-based discrimination claim is identical to her termination-based retaliation claim, except that the "discriminatory intent" required to sustain a discrimination claim is different from the "retaliatory intent" required for a retaliation claim. Retaliatory intent relates to Plaintiff's participation in protected activities; discriminatory intent relates to Plaintiff's protected characteristics. Dodd v. City Univ. of New York, 489 F. Supp. 3d 219, 251 (S.D.N.Y. 2020) (In a retaliation claim, "[t]he question for the jury on this point will be whether [defendant] took its adverse action because of [plaintiff's] protected activities, not because of her disability."); see also Lulo v. OTG Mgmt., LLC, No. 19-CV3776-PAE, 2022 WL 409224, at *8 (S.D.N.Y. Feb. 10, 2022) (describing "discriminatory intent" "as distinct from [] retaliatory intent"); Rosado v. City of New York, No. 18-CV-09760-AJN, 2020 WL 2836481, at *6 (S.D.N.Y. June 1, 2020) ("[W]hile the fact that these other employees also had discrimination complaints might lead to a minimal inference of retaliatory intent, it does not lead to a minimal inference of discriminatory intent.").

To show intent, Plaintiff proffers evidence that she was pressured into going into the office and traveling even though she had been granted work from home accommodations for her disability. (56.1 St. ¶¶ 20, 25, 30; 56.1 Counterst. ¶¶ 15, 23.) Similarly, when she asked for medical leave, Gross made comments that a reasonable juror could interpret as evincing discriminatory animus. For example, in response to Plaintiff's first request for leave (i.e., her fourth accommodation request), Gross told Plaintiff, "my doctors have recommended things to me and [I] sometimes follow them to a T, and sometimes I haven't. . . . I guess I just want you to own this decision." (Docket entry no. 113-47 at 4; 56.1 Counterst. ¶ 28.) This evidence is sufficient to frame a triable issue of fact as to whether Defendants were reacting to her disability in a discriminatory fashion. See McMillan v. City of New York, 711 F.3d 120, 129 (2d Cir. 2013) (denying summary judgment where plaintiff "was tardy because of his disability and that he was disciplined because of his tardiness. In other words, [plaintiff] was disciplined because of his disability"); Hampson v. State Farm Mut. Auto Ins. Co., No. 12-CV-00258-BKS-CFH, 2015 WL 12733387, at *15 (N.D.N.Y. Mar. 26, 2015) ("While Defendant asserted that Plaintiff's absences were the cause of her termination, if Plaintiff's absences were a manifestation of her disability they cannot be separated from the disability itself." (citation omitted)).

As to the other elements of Plaintiff's prima facie case and the McDonnell Douglas framework, the analysis is otherwise identical to that of Plaintiff's termination-based retaliation claim. Thus, Plaintiff's claim survives summary judgment for the reasons discussed above in connection with Plaintiff's termination-based retaliation claim. Supra § II.B.1.

2. Discriminatory Hostile Work Environment Claims

Next, the Court addresses Plaintiff's discriminatory hostile work environment claim. To prevail, a plaintiff must establish (1) facts demonstrating the existence of a hostile

work environment and (2) that the hostile work environment occurred "because of" Plaintiff's protected characteristics. See Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007).

As to the first prong, under the ADA and NYSHRL, Plaintiff "must produce evidence that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'"[8] Cruz, 202 F.3d at 570 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation omitted)). Courts consider a "nonexhaustive list of factors" to "determine[e] whether a hostile work environment exists, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 604-05 (2d Cir. 2006) (quoting Harris, 510 U.S. at 23). Even though this "severe or pervasive" standard is more stringent than the "materially adverse" standard for a retaliatory hostile work environment, see Carr, 76 F.4th at 179, 181, the same evidence Plaintiff proffers to show a retaliatory hostile work environment also suffices to show a discriminatory hostile work environment, supra § II.B.2.

As to the second prong, under the ADA, NYSHRL, and NYCHRL, Plaintiff must show that the conduct occurred "because of" Plaintiff's disability. Alfano v. Costello, 294 F.3d

[8] "The standard for maintaining a hostile work environment claim is lower under the NYCHRL." Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted). "The NYCHRL imposes liability for harassing conduct that does not qualify as 'severe or pervasive.'" Id. (citation omitted). A plaintiff need only show "the existence of unwanted [disability]-based conduct' because liability under NYCHRL is 'determined by the existence of unequal treatment.'" Id. (citation omitted). Nonetheless, even under the NYCHRL, "'petty, slight, or trivial inconvenience[s]' are not actionable." Id. (citation omitted). Because Plaintiff's claim survives under the more stringent ADA and NYSHRL standards, it also survives under the more lenient NYCHRL standard.

365, 374 (2d Cir. 2002) (citation omitted). This is also known as "discriminatory intent." See Raniola v. Bratton, 243 F.3d 610, 622 (2d Cir. 2001). Plaintiff has proffered evidence to show discriminatory intent for the reasons discussed above in connection with Plaintiff's termination-based discrimination claim. Supra § II.C.1. Accordingly, Defendants' motion for summary judgment dismissing this claim is denied.

D. ADA, NYHSRL, and NYCHRL Failure to Engage in an Interactive Process Claims (Counts Two, Four, and Six)

Plaintiff appears to bring a claim for Defendants' failure to engage in an interactive process. (Docket entry no. 122 ("Pl. Opp.") at 29-30.) Neither the ADA nor the NYSHRL provides an independent cause of action for failure to engage in an interactive process. Greenbaum v. New York City Transit Auth., No. 21-1777, 2022 WL 3347893, at *5 (2d Cir. Aug. 15, 2022) (summary order); Wellner v. Montefiore Med. Ctr., No. 17-CV-03479-KPF, 2019 WL 4081898, at *11-12 (S.D.N.Y. Aug. 29, 2019). Thus, Defendants' motion for summary judgment is granted to the extent Plaintiff brings this claim under the ADA or NYSHRL.

The NYCHRL, however, allows such a distinct claim. Greenbaum, 2022 WL 3347893, at *5. Defendants' summary judgment motion on this issue is denied as to the NYCHRL claim because the parties dispute, as a factual matter, whether Defendants engaged in an interactive process. Defendants claim that Gross requested information from Plaintiff regarding her ability to perform work functions with accommodation and that she never supplied such information; Plaintiff claims that Gross was unresponsive to her requests for information as to what functions the company wanted her to perform. (E.g., 56.1 St. ¶¶ 41, 45, 48; 56.1 Counterst. ¶¶ 27-29, 41-42.)

E. Aiding and Abetting Claim Against Gross Under the NYCHRL (Count Eight)

Plaintiff brings an aiding and abetting claim against Gross under the NYCHRL. This claim survives, to the extent the underlying NYCHRL claims survive, because Gross is alleged to have been the principal actor for Newsela in the circumstances underlying Plaintiff's claims.[9] (E.g. 56.1 Counterst. ¶¶ 15, 20, 23, 25, 28, 30.)

F. FMLA Claims (Count One)

Next, the Court addresses Plaintiff's FMLA interference and retaliation claims. For the reasons explained below, summary judgment is denied as to interference and is denied in part and granted in part as to retaliation.

1. Employee Status

As a threshold issue, Defendants argue that Plaintiff did not become an "employee" within the meaning of the FMLA until January 16, 2017, and that Plaintiff never became an "eligible employee" entitled to leave under the FMLA because FMLA rights only accrue after twelve months of employment. Triable issues of fact exist, however, as to when Plaintiff became an "employee" and, therefore, as to whether she was ever an "eligible employee" as defined by the FMLA. 29 U.S.C. § 2611(2)(A). To be an "eligible employee," plaintiff must have (1) been an employee, (2) worked for her employer for twelve months by the

---

9 The Court notes that Gross's conduct appears to serve as the sole predicate for Newsela's liability. District courts in this Circuit are split as to whether an individual employee can be held liable for aiding and abetting their employer's discrimination where their own conduct solely forms the basis of a discrimination claim against their employer. See Murtha v. N.Y. State Gaming Comm'n, No. 17-CV-10040-NSR, 2019 WL 4450687, at *18 (S.D.N.Y. Sept. 17, 2019) (discussing the split). The majority of courts, however, recognize such an aiding and abetting cause of action. Doe v. Benjamin Zaremski M.D., P.C., No. 21-CV-03187-ER, 2022 WL 2966041, at *7 (S.D.N.Y. July 27, 2022). Because Defendants did not raise this issue, the Court sees no reason to depart from the majority approach.

time she requested FMLA leave, and (3) accumulated 1,250 hours of service over those past twelve months. Robbins v. Candy Digital Inc., No. 23-CV-10619-LJL, 2024 WL 5056429, at *7 (S.D.N.Y. Dec. 9, 2024).

As noted above, the parties dispute when Plaintiff became an "employee."[10] Defendants argue that Plaintiff only became an employee on January 16, 2017, when she officially took on the Chief People Officer role pursuant to the employment agreement. Prior to that date, Defendants contend, Plaintiff was an independent contractor. (Defs. Mem. at 15.) If Defendants are correct, Plaintiff would only have been entitled to FMLA leave beginning on January 16, 2018 (twelve months after she became an employee)—which is a few months after Plaintiff's employment was terminated on October 30, 2017. Under Defendants' framing, Plaintiff has no viable FMLA claims whatsoever. Plaintiff avers, in opposition, that she qualified as an employee beginning in "mid-October 2016." (Pl. Opp. at 33.) Under Plaintiff's theory, she would have become entitled to FMLA rights beginning in mid-October 2017 (twelve months after she became an employee and shortly before she made her final leave request).

To determine whether an individual is an employee or an independent contractor under the FMLA, courts apply the "economic realities test." Stack v Karr-Barth Assoc., No. 18-CV-10371-VEC, 2021 WL 1063389, at *8-9 (S.D.N.Y. Mar. 18, 2021) (citing Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988)). This test originates from the Fair Labor

---

[10] It is reasonable to infer that Plaintiff had "accumulated 1,250 hours of service" since mid-October 2016. Assuming Plaintiff worked 40 hours a week from mid-October 2016 to mid-July 2017 (when she made her first request for leave), she would have worked roughly 1440 hours (9 months × 4 weeks a month × 40 hours a week). (See 56.1 St. ¶ 8 (showing that Plaintiff worked 762 hours during the four-month period from September 19, 2016 to January 16, 2017).) In any event, Defendants do not contest and, therefore, have waived any argument as to the hours-of-service requirement.

Standards Act ("FLSA") and has been applied in the FMLA context because "[t]he definition of 'employ' in the FMLA is the same as the definition of 'employ' in the FLSA." Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 77 n.15 (2d Cir. 2003) (citing 29 U.S.C. § 2611(3)); see Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 422 (2d Cir. 2016). The test weighs several factors: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." Brock, 840 F.2d at 1058-59. "No one of these factors is dispositive; rather, the test is based on a totality of the circumstances." Id. Nor are these factors "exclusive," and "any relevant evidence may be considered." Id. at 1059 (citation omitted). Similarly, contractual language disclaiming an employment relationship is not dispositive. See Ivanov v. Builderdome, Inc., No. 19-CV-03422-LJL, 2020 WL 5768691, at *3 (S.D.N.Y. Sept. 28, 2020); see also Irizarry v. Catsimatidis, 722 F.3d 99, 104 (2d Cir. 2013). The "ultimate concern" is "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." Brock, 840 F.2d at 1059. Furthermore, the Supreme Court has observed that the "definition of 'employ' 'stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles,' in order to effectuate the remedial purposes of the act." Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23 (1992)).

Here, summary judgment is precluded because genuine issues of fact exist concerning whether—notwithstanding the fact that Plaintiff's services were contracted and paid

for through her own company—Plaintiff was in economic reality Newsela's employee from October 2016 onward. As to the first factor, Plaintiff proffers evidence that Defendants controlled her work. See Thomas v. TXX Servs., Inc., No. 13-CV-02789-SIL, 2021 WL 1034677, at *6 (E.D.N.Y. Mar. 15, 2021) (The "impos[ition of] inflexible shifts" and "demand[ing that] workers achieve large quotas or work long hours such that it is impractical to work elsewhere" weighs in favor of finding an employment relationship.). Plaintiff testified that Gross "directed where I worked, when I worked, and how I spent my time" and that Gross told her "I need you in the office five days in the week." (Ostenfeld Dep. at 54.) Indeed, Plaintiff's consulting invoices show that beginning in mid-October, Plaintiff consistently worked nearly forty hours a week—and oftentimes more—for Newsela. (Docket entry no. 113-4.)

With respect to the second factor, Plaintiff introduces evidence that she did not make any significant investments of capital to perform services for Defendants. (56.1 Counterst. ¶ 8); see Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 191 (S.D.N.Y. 2003) (finding this factor "weighs heavily in favor of an employment relationship" where "plaintiffs' investment in the business was negligible"). And, given Plaintiff's testimony that Gross required her in the "office five days in the week" and her significant workload for Newsela, (Ostenfeld Dep. at 51, 54; docket entry no. 113-4), there is evidence that Plaintiff did not have opportunity for independent profit or loss by working for others or moderating her workload because "the *Company* controlled the work assignments and required [her] to take or keep unwanted assignments, at times to Plaintiff['s] financial detriment." Thomas, 2021 WL 1034677, at *8.

On the fourth factor, Plaintiff provides evidence that she had a "long-term, stable work relationship, of indefinite duration." See Kinney v. Artist & Brand Agency LLC, No. 13-CV-08864-LAK-DF, 2015 WL 10714080, at *16 (S.D.N.Y. Nov. 25, 2015), report &

recommendation adopted, 2016 WL 1643876 (S.D.N.Y. Apr. 22, 2016). Plaintiff consistently worked nearly forty hours a week—and oftentimes more. (Docket entry no. 113-4.) And, because of her work for Defendants, Plaintiff was unable to work for others. See Thomas, 2021 WL 1034677, at *10 (considering as relevant "whether the workers were free to perform work for others while working for the company in question"). Finally, on the fifth factor, Plaintiff points to evidence that, by mid-fall 2016, she was fully integrated into Newsela's operations and that she had several direct reports. (56.1 Counterst. ¶ 7.) Indeed, a November 21, 2016, internal, company-wide email introduced Plaintiff as the "acting Head of People Operations" who "will be reporting directly to Matt Gross." (Docket entry no. 124-18.)

2. FMLA Interference and Retaliation Claims

Under the FMLA, an "eligible employee" with "a serious health condition that makes the employee unable to perform the functions of the position of such employee" is "entitled" to twelve weeks of unpaid leave per year. 29 U.S.C. § 2612(a)(1)(D). Plaintiff brings an interference claim and a retaliation claim in relation to this right afforded by the FMLA.

"[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." Woods v. START Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 166 (2d Cir. 2017) (citing Graziadio, 817 F.3d at 424). Plaintiff alleges that Defendants prevented or otherwise impeded her ability to exercise her right to FMLA leave by denying her October 26, 2017 request for leave. (Pl. Opp. at 32-38.) Defendants, on the other hand, argue that there was no FMLA violation even if Plaintiff had become eligible under the statute before her employment terminated, because Plaintiff took 15 weeks of leave, exhausting her 12 weeks of FMLA leave. (Defs. Mem. at 22-23.) This argument fails, however, because an employer must "notify the employee whether the

[employee's] leave will be designated and will be counted as FMLA leave within five business days" of "[w]hen the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason." 29 C.F.R. § 825.300(d)(1). Leave may be retroactively designated as FMLA leave only "with appropriate notice to the employee as required by § 825.300 provided that the employer's failure to timely designate leave does not cause harm or injury to the employee." 29 C.F.R. 825.301(d). Defendants did not properly designate FMLA leave retroactively, and they concede as much. (Defs. Reply at 19 n.11.) Nor do they proffer any legal basis for counting a period prior to FMLA eligibility as covered leave. Thus, Plaintiff's FMLA interference claim survives.

"Retaliation' claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." Woods, 864 F.3d at 166 (2d Cir. 2017) (citing Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004)). Plaintiff alleges that Defendants took two "adverse employment actions" in retaliation for her requests for FMLA leave—her termination and subjecting Plaintiff to a hostile work environment. (Pl. Opp. at 13.) The first claim survives summary judgment for the same reasons her termination-based retaliation claim survives under the ADA, NYSHRL, and NYCHRL. See Potenza, 365 F.3d at 168 (applying McDonnell Douglas to an FMLA retaliation claim); Graziadio, 817 F.3d at 429 (same).

The second claim, which is for retaliatory hostile work environment, is premised on Defendants' conduct in response to Plaintiff's first seven accommodation requests. Defendants' conduct in response to Plaintiff's eighth accommodation request—termination of Plaintiff's employment—does not form the basis for a standalone FMLA retaliatory hostile work

environment claim. Even if a claim for retaliatory hostile work environment were cognizable under the FMLA, which is an unresolved question,[11] this claim fails because Plaintiff concedes she was not an employee until mid-October 2016—meaning that none of her first seven accommodation requests even implicated "rights protected under the FMLA." Plaintiff cannot claim retaliation for exercising a right that was not protected by the FMLA. Kim v. Goldberg, Weprin, Finkel Goldstein, LLP, 862 F. Supp. 2d 311, 318 (S.D.N.Y. 2012). Therefore, Plaintiff's retaliatory hostile work environment claim must be dismissed.

G. Breach of Contract Claim (Count Nine)

Finally, the Court addresses Plaintiff's breach of contract claim, which alleges that Defendants breached the Employment Agreement by failing to provide her with salary continuation in connection with the termination of her employment. The viability of this claim turns on whether Plaintiff's termination was an "Involuntary Termination" under the Employment Agreement. Because issues of fact exist concerning this question, summary judgment is denied.

---

[11] The Court notes that there appears to be a Circuit split over whether a retaliatory hostile work environment claim may be brought under the FMLA. Compare Wyatt v. Nissan North America, Inc., 999 F.3d 400, 427-28 (6th Cir. 2021) (countenancing such a claim); Tarpley v. City Colleges of Chicago, 752 F. App'x 336, 346-49 (7th Cir. 2018) (summary order) (same); and Felts v. DeJoy, No. 21-CV-00370-LF-KK, 2022 WL 4332712, at *7 (D.N.M. Sept. 17, 2022) (same) with Frizzell v. Delta Air Lines, Inc., No. 19-CV-1573-TWT-JSA, 2019 WL 5459074, at *9 (N.D. Ga. Aug. 29, 2019) (disapproving of such a claim), report and recommendation adopted, No. 19-CV-1573-TWT, 2019 WL 11441426 (N.D. Ga. Oct. 9, 2019); Jahnke v. Discover Prods., Inc., No. 18-CV-5259-SLE, 2019 WL 2248528, at *4 (N.D. Ill. May 24, 2019) (same); Elder v. Elliott Aviation, Inc., No. 15-CV-4123-SLD-JEH, 2016 WL 5213909 at *4 (C.D. Ill. Sept. 20, 2016) (same); and Smith-Schrenk v. Genon Energy Servs., L.L.C., No. 13-CV-2902-GHM, 2015 WL 150727, at *4 n.60 (S.D. Tex. Jan. 12, 2015) (same). The Second Circuit does not appear to have considered this issue.

Plaintiff's Employment Agreement provides that Plaintiff would be "entitled to [certain] benefits," including salary continuation, if she were "subject to an Involuntary Termination." (Docket entry no. 113-7 ("Employment Agreement") at 3 (section 5(a)).) An "Involuntary Termination" includes a "Termination Without Cause," which, in turn, is defined as "a Separation as a result of a termination of your employment by the Company without Cause, provided you are willing and able to continue performing services within the meaning of the Treasury Regulation I:409A-l(n)(1)."[12] (Employment Agreement at 5.) The parties dispute whether Plaintiff was "willing and able to continue performing services" at the time of her separation on October 30, 2017. For the same reasons that the Court cannot grant summary judgment on the issues of whether Plaintiff's leave request was a request for indefinite leave and whether Plaintiff was able to return to work following her leave, supra § II.A.5, the Court cannot grant summary judgment on the breach of contract claim. Defendants' motion is denied.

## III. CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is granted in part and denied in part. The motion is granted as to Plaintiff's claim that Defendants failed to accommodate her third, fourth, fifth, sixth, and seventh accommodation requests (Counts 2, 4, and 6); as to Plaintiff's claim that Defendants failed to engage in an interactive process under the ADA and NYHSRL (Counts 2, 4, and 6); and as to Plaintiff's retaliatory

12 "Separation" is a "'separation from service,' as defined in the regulations under Section 409A of the Code." (Employment Agreement at 5.)

hostile work environment claim under the FMLA (Count 1). The motion is denied with respect to all of Plaintiff's other claims. Docket Entry No. 111 is resolved.

A Final Pretrial Conference is hereby scheduled for **Friday, February 19, 2027**, and the parties are directed to consult, exchange documents and make submissions in accordance with the Pretrial Scheduling Order filed contemporaneously herewith**.** The parties are further directed to arrange promptly for a settlement conference with Magistrate Judge Wang, to whom this case will be referred for that purpose, and to file a joint status report, including their estimate of the amount of time that will be required for any contemplated trial, by **Tuesday, December 21, 2026**.

SO ORDERED.

Dated: New York, New York
September 15, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge